2025 IL App (1st) 240824-U

No. 1-24-0824

Order filed October 28, 2025

SECOND DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

<table>
<tr><td>THE PEOPLE OF THE STATE OF ILLINOIS,<br><br>    Respondent-Appellee,<br><br>v.<br><br>ANTONIO VEGA,<br><br>    Petitioner-Appellant.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>Appeal from the Circuit Court<br>of Cook County<br><br>No. 16 CR 09876-03<br><br>Honorable<br>John F. Lyke, Jr.,<br>Judge Presiding.</td></tr>
</table>

JUSTICE D.B. WALKER delivered the judgment of the court.
Presiding Justice Van Tine and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The evidence was sufficient to support defendant's conviction, and defendant's other arguments were all either withdrawn or forfeited. Affirmed.

¶ 2    Defendant Antonio Vega (Defendant) appeals his conviction for attempted murder in connection with the April 16, 2016 shooting of victim Diego Melero (Melero). In this direct appeal, defendant argues that the evidence presented by the State was insufficient to sustain his conviction, and that evidence of a firearm recovered from defendant's vehicle when he

was arrested was improperly introduced to the grand jury that indicted him. We affirm the circuit court's decision.

¶ 3                                  I. BACKGROUND

¶ 4        On April 16, 2016, Melero was shot in the back on a residential street on the west side of Chicago. Later the same day, defendant's vehicle was stopped by police officers in Will County, and a TEC-9 semiautomatic handgun and a .22 caliber revolver were recovered from the vehicle. Defendant was arrested in Will County and charged with aggravated unlawful use of a weapon. On June 23, 2016, a Cook County grand jury indicted defendant on 19 of the 21 counts originally included in the indictment: five counts of attempted murder, one count of aggravated battery, one count of aggravated discharge of a firearm, and twelve counts of aggravated unlawful use of a weapon. The record on appeal does not contain a transcript of the grand jury proceedings. Defendant alleges that the traffic stop was later found to be unlawful by the Will County circuit court and that the firearms recovered during the stop were suppressed. The record does not contain an order to that effect, and defendant does not specify the date of that order. The State's Attorney modified the Cook County indictment to remove references to particular handguns. Defendant waived his right to a jury trial and the case proceeded as a bench trial.

¶ 5        Melero testified at trial that he received a Facebook message from the account belonging to Toni Ramirez (Toni) on April 16, 2016, in which she sought to buy marijuana from him. Melero was familiar with Toni because he was friends with her boyfriend, Fernando Ramirez (Fernando). Melero did not initially respond, as he was at work, but later exchanged messages establishing an amount and a price. Melero initially agreed to meet Toni at a grocery store in Cicero near his residence. After he arrived at the grocery store, he received

another message stating that there were police in the area. Toni suggested another meeting place, which Melero rejected because it was too far away, and the two eventually agreed to meet at a church two blocks from the grocery store.

¶ 6 When Melero arrived at the church, he saw Toni in the passenger seat of a gold-colored sedan. There were three other people in the vehicle with Toni, all of whom Melero recognized. Defendant, who Melero knew personally, was driving. Fernando was in the back seat along with Alexis Rosas (Rosas), who Melero knew by name, but only as a friend-of-a-friend. Melero handed over the requested marijuana to defendant, but defendant stated that he did not have the money and would need to visit a nearby gas station for change. Melero got into the car between Fernando and Rosas in the back seat, and the group drove away from the church. Instead of driving toward the nearby gas station, defendant turned onto Roosevelt Road and proceeded toward Chicago. Melero was under the impression that he would be smoking marijuana with the group and was unworried about the change of course, as he knew everyone in the vehicle. The mood in the car turned "quiet" after defendant instructed Melero to not tell anyone that he had seen defendant.

¶ 7 After about ten minutes of driving, defendant pulled over in a residential area on Grenshaw Street and asked Melero to get out of the car so that defendant could talk to him. Melero complied and stood outside the driver-side door, in front of the open window, to speak with defendant. Defendant reached under the passenger seat and produced a handgun that Melero described as having a long barrel with holes in it. Defendant rested the handgun on the windowsill, inches from Melero's abdomen, and pulled the trigger. The gun produced a click but did not fire. Defendant began to "mess" with the weapon's slide to unjam the weapon. Melero turned and fled but ran into a tree just as he felt a shot hit him in the back.

3

¶ 8        Melero continued to run and looked back to see that defendant had driven away. Melero ran past the First Grace Missionary Baptist Church parking lot and saw a woman, Tanisha Weeks (Weeks), standing on her porch. Melero informed her that he had been shot, and she went inside to call the police while Melero waited on her porch. Weeks returned moments later, but her expression turned to one of fear and she stepped back inside and closed the door. Melero looked in the direction Weeks had been looking and saw Fernando and Rosas emerging from an alley along the side of the house. Fernando urged Rosas to shoot Melero and threw a brick at Melero. Rosas raised a metallic revolver toward Melero and fired at him. Either the brick or a bullet broke a window behind Melero. Melero jumped off the side of the porch into a neighbor's yard, where he hid under a staircase. He testified that he heard the distinctive loud exhaust of defendant's car and saw it in the nearby alley, but it drove away. Melero emerged from his hiding spot after the car left, accepted a towel from a man, and lay in the yard until an ambulance arrived.

¶ 9        Melero suffered a ruptured spleen, which was removed, and damage to one of his lungs and his intestines. While at the hospital, police officers showed photo arrays to Melero, in which he identified defendant, Fernando, and Rosas. Video from the First Grace Missionary Baptist Church was played at trial, and Melero confirmed that it showed defendant's car prior to the shooting and Melero running past after the shooting. That video is not included in the record on appeal.

¶ 10        David McCaskill testified that he lived in the neighborhood where the shooting took place. He heard multiple gunshots and saw Melero running. Shortly thereafter, he saw two men emerge from an alley before one of them shot at Melero. He saw Melero jump off the porch and the two men retreating the direction from which they had come.

¶ 11    On direct examination, Toni testified that she was fourteen years old on April 16, 2016, and that she had been using marijuana, alcohol, and Xanax that day. She, defendant, Fernando, and Rosas discussed robbing Melero because he was known in their Cicero neighborhood as a snitch. Toni allowed defendant to use her Facebook account to message Melero and set up the drug purchase that they would use to lure Melero into their vehicle. Toni's account of picking up Melero and driving to Chicago matches Melero's own account. After defendant had Melero exit the vehicle, defendant retrieved a TEC-9 semiautomatic handgun that she had previously seen in his possession. Toni stated that defendant attempted to shoot Melero, but the gun wasn't working properly. Nonetheless, defendant managed to rectify the problem and shoot Melero. Melero then ran to a nearby house. Defendant drove to an alley near the house and ordered Rosas, who had a revolver, to get out of the car. He then told Fernando to get out as well, to serve as the lookout. The two ran off down the alley, Toni heard gunshots, and the two men returned shortly thereafter, at which point the four departed in defendant's vehicle.

¶ 12    On cross-examination, Toni confirmed that she was not only heavily under the influence of drugs at the time of the shooting, but also at the later date when she went with her mother to speak with the state's attorney. Toni's testimony regarding gunshots on cross-examination was confusing and self-contradictory, and included the following excerpts:

"Q: [As Melero is] running, okay, how many gunshots did you hear?

A: There were no gunshots yet.

Q: When did that occur?

A: When I told you. We pulled around into the alley and told [Rosas] to get out.

Q: That's when you heard gunshots?

A: Yes.

Q: How many did you hear?

A: Two.

Q: And [defendant] is with you, correct?

A: Yes.

Q: He never got out of the vehicle, correct?

A: No.

Q: And he never fired the weapon there either, correct?

A: If the weapon would have went off, then, yes.

Q: But it didn't go off, correct?

A: No.

* * *

Q: Then you're saying also that the window was up on the car, on the driver's side, correct?

A: Yes.

Q: It was never down, correct?

A: No.

Q: And you never saw my client point any weapon and use the door sill as support, correct?

A: No.

Q: And you never saw him point the gun, alleged gun at [Melero]?

A: No. He had the door open.

6

Q: But you said the gun didn't fire, correct?

A: He went to point it at [Melero] and tried to fire it. It did not work."

¶ 13    On redirect examination, Toni confirmed that Melero was standing outside the driver-side door, defendant was sitting in the car with the door open, and defendant attempted to shoot Melero through the open door, but the gun jammed. The following exchange occurred during redirect examination:

"Q: While [Melero] was running, that's when the defendant shot him; is that right?

A: No.

Q: Well earlier on direct, when we were talking, that the defendant shot [Melero]. So when did that happen?

A: I do not recall."

Toni confirmed on redirect examination that she had stated, in her videotaped interview with the State's Attorney, that defendant did not shoot Melero "from inside the car," but instead "shot him outside the car." Although Toni denied remembering giving that answer, she agreed that she must have done so, based on the video evidence.

¶ 14    Weeks testified that she was sitting on her porch with her grandmother when she saw a car containing four or five Hispanic people pull up to the curb near her home. She paid attention because she said it was unusual to see Hispanic people in her neighborhood, which she described as an African American neighborhood. The car pulled off and moved further down the street. About thirty seconds later, Weeks heard a gunshot. She immediately began to help her grandmother inside. While she was helping her grandmother, Melero approached on the sidewalk and asked her to call the police because he had been shot. She initially did not believe him, because he was too calm, but once she saw that blood was spreading across

his shirt, she called 911. While she was inside ensuring that her home was locked up and safe, she heard another gunshot, which prompted her to call 911 a second time. About a minute after the second gunshot, she returned outside with towels, which she gave to Melero to help him with the bleeding. Weeks noticed that a large window on the front of her home had been broken. She stayed on the phone with 911 and waited with Melero until an ambulance arrived.

¶ 15    Detective Patrick Munyon was called largely to establish foundation for the videotaped interview of Toni, though that video was not included in the record on appeal. Munyon also offered testimony regarding the firearm defendant allegedly used. He stated that the TEC-9 is a semiautomatic handgun and therefore ejects casings automatically when it is fired, and that those casings will usually land within ten feet or so of the shooter, but a revolver retains its spent casings until they are manually ejected. No casings were recovered from the scene of the shooting.

¶ 16    Following closing arguments, the circuit court found that defendant personally discharged a firearm and caused great bodily harm to Melero. The court found defendant guilty of all counts that were brought to trial, but on sentencing those merged into a single count of attempted murder. Defendant filed a motion for judgment of acquittal or a new trial, and then an amended motion to the same effect on September 5, 2023. In it, defendant argued that (1) he did not knowingly waive his right to a jury trial, (2) the State introduced evidence before the grand jury that was obtained in violation of his Fourth Amendment rights, as well as evidence without a factual basis, (3) the State constructively amended the indictment in violation of *Stirone v. United States*, 361 U.S. 212 (1960), and (4) the evidence presented

was insufficient to sustain defendant's convictions. The court denied defendant's motion, and sentenced defendant to 31 years' imprisonment. This timely appeal follows.

¶ 17                                    II. ANALYSIS

¶ 18        Defendant initially raised the same four arguments on appeal that were contained in his motion for a new trial: (1) the evidence was insufficient to support defendant's conviction, (2) the evidence recovered from the improper traffic stop should not have been introduced to the grand jury, because it is fruit of the poisonous tree, (3) the grand jury indictment was improperly amended, and (4) defendant did not knowingly waive his right to a jury trial. In his reply brief, defendant explicitly abandoned his third and fourth arguments, leaving only the first two for our consideration.

¶ 19                          A. Sufficiency of the Evidence

¶ 20        When presented with a sufficiency of the evidence claim, this court "does not retry the defendant, and the trier of fact remains responsible for making determinations regarding the credibility of witnesses, the weight to be given to their testimony, and the reasonable inferences to be drawn from the evidence." *People v. Wright*, 2017 IL 119561, ¶ 70. While the circuit court's factual findings are not binding upon this court, they are owed great deference, as it was the circuit court that had the opportunity to hear and see the witnesses testify live in open court, while we are afforded only a transcript. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Our task is to determine "whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (emphasis in original) *Wright,* 2017 IL 119561, ¶ 70. "A conviction will not be set aside on appeal unless the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the

defendant's guilt." *Id*. Furthermore, "[t]he credible testimony of a single witness, even if contradicted by the defendant, is sufficient to convict a defendant." *People v. Sauls*, 2022 IL 127732, ¶ 52.

¶ 21    Although defendant correctly identifies our standard of review, he fails to address those elements, and he does not even cite the relevant attempt and murder statutes. In his reply brief, he defends this choice by asserting that "[t]he 'element' that was not proved throughout is the 'who,' " and since no witness can credibly testify as to who fired the bullet that hit Melero, the conviction cannot be sustained. Defendant's decision to place quotation marks around "element" and his reliance instead on a less formal rubric without any citation is troubling. Regardless of those assertions, we indeed must examine the actual elements of the crime detailed in the relevant statute. Under section 8-4 of the Criminal Code of 2012, "[a] person commits the offense of attempt when, with intent to commit a specific offense, he or she does any act that constitutes a substantial step toward the commission of that offense." 720 ILCS 5/8-4 (West 2016). The charging instrument indicated the attempted offense was first degree murder, which was defined at that time as follows:

> "(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:
>
> (1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or
>
> (2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another; or
>
> (3) he is attempting or committing a forcible felony other than second degree murder." 720 ILCS 5/9-1 (West 2016).

¶ 22    Defendant focuses extensively on conflicts between the testimony of witnesses, but as we have established, the testimony of a single witness is enough to sustain a conviction. *Sauls*, 2022 IL 127732, ¶ 52. Although defendant devotes most of his opening brief to pointing out issues with Toni's testimony and drawing into question her credibility, the testimony of Melero, alone, is sufficient to sustain defendant's conviction. Defendant states repeatedly that Melero's testimony cannot support the conviction because his back was turned, and he did not see who fired the shot that hit him. Again, this court is required to view the evidence in the way that is most favorable to the prosecution. *Wright*, 2017 IL 119561, ¶ 70. It is a reasonable inference that after defendant pulled the trigger of a handgun pointed at Melero's abdomen from inches away and began to attempt to unjam the weapon, the shot that hit Melero moments later came from that same weapon. This is especially true considering that there is no testimony that any other door or window was open, no windows on the vehicle were broken, and only the defendant was named as the shooter.

¶ 23    However, given defendant's explicit disregard for the specific elements of the crime, we also note that defendant's sole focus on who fired the shot that injured Melero is misplaced. Even if Melero's testimony ended when he turned his back to run, that testimony could support a conviction of attempted murder. Defendant aimed a handgun at Melero at point-blank range and pulled the trigger. That is a substantial step toward killing or inflicting great bodily harm on Melero. Whether that was defendant's specific intent or not, we have no doubt that he knew that such an action would cause great harm to Melero. See *People v. Ramirez*, 2013 IL App (4th) 121153, ¶¶ 83-86. Defendant acknowledges this in his reply brief, but states that Melero's inability to see who pulled the trigger on the shot that hit him

makes it impossible for him to know who took that substantial step. But again, we need not concern ourselves with the shot that hit him. The first jammed attempt to shoot was enough.

¶ 24    Lastly, defendant argues that there is no evidence that he intended to harm or kill Melero. Defendant suggests that even if one credits Toni's testimony, that testimony only establishes an intent to rob Melero, as Toni's testimony regarding whether defendant shot Melero creates reasonable doubt. Additionally, defendant posits it is possible that he ordered Fernando and Rosas out of the car without instructing them to harm anyone, and that he may not have known that Rosas had a firearm. Defendant suggests that his decision to remain in the car in the alley until Fernando and Rosas returned may simply have been because he was still their ride home, even though they had just attempted to murder Melero. Defendant states that, because Toni was intoxicated on a mixture of marijuana, alcohol, and Xanax at the time of the offense, "to say her credibility is questionable is putting it mildly." There is nothing in the record that suggests that Toni's level of marijuana, alcohol, and Xanax use rose to the level of rendering her incapable of identifying who shot Melero.

¶ 25    Defendant's reliance on an implausible, but technically possible, innocent explanation for the events described in witness testimony at trial is misplaced. If we were to accept such tall tales as enough to create reasonable doubt, intent would only be provable in cases in which the would-be or actual killer stated clearly: "I intend to kill you." The question before us is not whether the evidence could have supported a version of events in which defendant is innocent; the question is whether it was sufficient to support the conviction defendant received. *People v. Newton,* 2018 IL 122958, ¶ 24 (2018) ("In weighing evidence, the trier of fact is not required to disregard inferences which flow normally from the evidence before it,

12

nor need it search out all possible explanations consistent with innocence and raise them to the level of reasonable doubt."). The evidence was sufficient, and defendant's argument fails.

¶ 26                                    B. Grand Jury Evidence

¶ 27        Defendant alleges that the grand jury was presented with evidence that a traffic stop later on the same day the shooting took place resulted in the discovery of firearms matching the descriptions given for defendant's TEC-9 handgun and Rosas' revolver. Defendant further alleges that this evidence was suppressed by the Will County circuit court because it was the product of an unlawful traffic stop and therefore is considered "fruit of the poisonous tree." Defendant argues that because the recovery of the weapons was the result of an unlawful stop, the weapons were not only inadmissible at trial in Will County, but introducing that evidence before the Cook County grand jury rendered the indictment invalid.

¶ 28        The State points out a number of flaws in defendant's argument, but the most fatal is that defendant fails to establish that the Will County decision suppressing the firearms evidence was entered before the grand jury proceedings took place. The Will County order was delivered orally and neither a copy of the paper order nor a transcript is included in the record. The Third District appellate decision reviewing the matter quotes the court's lengthy oral ruling in full but does not specify when the ruling was made. *People v. Ramirez*, 2018 IL App (3d) 170065, ¶ 23. Although the parties' briefs do not specify any date for the Will County order, an extensive review of the record reveals that on February 22, 2022, the State filed a "Motion in Limine to Bar Credibility Finding" that included as an exhibit a letter from the Will County State's Attorney regarding the unlawful stop. In that letter, the date of the

order suppressing the evidence is stated as January 17, 2017. Even if we were to credit this date, defendant was indicted June 23, 2016, so defendant's argument fails.

¶ 29    In his reply brief, defendant withdrew "any previous assertion that the grand jury proceedings took place after the evidence was suppressed" and introduced a new argument that the timing was irrelevant and that the State should have known that the evidence would eventually be suppressed and, as such, it was improper to introduce it. However, under Illinois Supreme Court Rule 341, "[p]oints not argued are forfeited and shall not be raised in the reply brief." Ill. S. Ct. R. 341 (eff. Oct 1, 2020). Accordingly, defendant's initial argument on this point would fail, but was withdrawn, and his new argument on this point will not be considered.

¶ 30                                        III. CONCLUSION

¶ 31    For the foregoing reasons, we affirm defendant's conviction.

¶ 32    Affirmed.